UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

MARCELL WILLIAMS,

Petitioner,

v.

TIMOTHY FILSON,

Respondent.

No.  2:18-cv-01305 KJM KJN

FINDINGS & RECOMMENDATIONS

I.  Introduction

Petitioner is a state prisoner, proceeding without counsel, with an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his 2015 conviction for second degree robbery with use of a firearm.  He was sentenced to twenty-seven years in state prison. Petitioner claims that trial counsel was ineffective for failing to obtain a ruling on prejudicial photographs and to object more fully, and contends the trial court erroneously admitted photographs of gang tattoos and firearms in violation of his due process rights.  After careful review of the record, this court concludes that the petition should be denied.

//

//

//

//

II.   Procedural History

On February 27, 2015, a jury found petitioner guilty of second degree robbery (Cal. Pen. Code, § 211) with use of a firearm (Cal. Pen. Code, § 12022.53(b)).  (LD 1 at 150; LD 4 at 15.)[1] On March 20, 2015, petitioner was sentenced to twenty-seven years in state prison.  (LD 1 at 177; LD 4 at 22-29.)

Petitioner appealed the conviction to the California Court of Appeal, Third Appellate District.  (LD 7 & 9.)  The Court of Appeal affirmed the conviction on July 30, 2019.  (LD 10.)

Petitioner filed a petition for review in the California Supreme Court (LD 11), which was denied on July 19, 2017 (LD 12).

Thereafter, petitioner filed the original habeas petition in this court on May 21, 2018. (ECF No. 1.)

In an Order and Findings and Recommendations filed September 17, 2018, the undersigned recommended petitioner's motion for stay be denied and that he be ordered to file an amended petition raising only his exhausted claims.  (ECF No. 7.)  Shortly thereafter, petitioner filed a first amended petition.  (ECF No. 8.)

Following the district judge's order of March 6, 2019 (ECF No. 9), adopting the findings and recommendations in full, petitioner filed the operative second amended petition for writ of habeas corpus (ECF No. 15).  Respondent filed its answer on June 11, 2019.  (ECF No. 21.) Petitioner did not file a reply.

III.   Facts[2]

In its unpublished memorandum and opinion affirming petitioner's judgment of conviction on appeal, the California Court of Appeal for the Third Appellate District provided the following factual and procedural summary:

---

[1] "LD" refers to the documents lodged by respondent on July 30, 2019; specific page references are to the page numbers assigned at the time of electronic filing.  "ECF" refers to the court's case management/electronic filing system and docket entry for this particular matter.

[2] The facts are taken from the opinion of the California Court of Appeal for the Third Appellate District in People v. Williams, No. C079293 (5/10/2017), a copy of which was lodged by respondent as LD 10 on July 30, 2019.  (ECF No. 23.)

On May 17, 2012, Pardip Sangha was working in a cigarette store when defendant and another man entered the store. Defendant, who was wearing a wig and sunglasses, walked to the cash register where Sangha was standing, pulled a gun from his pocket, told Sangha the gun was real, and "raised it up." He demanded money, cigarettes, and other things from Sangha while the other man vaulted a counter and put into a bag items from the store. Sangha gave the defendant all the money that was in his register. Meanwhile, the other man repeatedly told defendant to shoot Sangha. Defendant told Sangha this was "not the first time he is doing this, he had done this before, so whatever he is saying [Sangha had] to follow."

After the robbery, Sangha told police that "he was sure he could recognize the armed suspect." He also told police the gun used to rob him was a "snubbed nose revolver type of handgun."

On May 22, 2012, Detective Mike French contacted Sangha. Sangha told Detective French he recognized the gunman as defendant, a frequent customer of the store who had many tattoos on his upper torso, neck, and face. Sangha described the gun used in the robbery as a dark revolver with a brown handle and a short barrel. He later identified defendant as the gunman in a six-pack photo lineup, and identified in a photograph the gun used by defendant to rob him.

Further investigation revealed a fingerprint, left on the counter during the robbery, belonged to defendant's brother, Anton Jefferson.

A week after the robbery, defendant and Jefferson were stopped by police. Defendant was taken to the police station and placed in an interview room. It is common practice in the Sacramento Police Department for officers to leave personal items found with suspects outside of the interview room the suspect was taken to. Detective Shawn Ayers took a cell phone that was placed outside of defendant's interview room and searched it. Although Detective Ayers was at the scene of the traffic stop, he was not the person who initially found the phone. In fact, he did not know who specifically, besides stating that it was a transport officer, could have seized the phone or put it outside defendant's interview room. He also never determined who the subscriber to the phone was or had any knowledge that that was ever done. Detective Ayers denied learning that the phone did not belong to defendant and had no knowledge to dispute a claim the phone did not belong to defendant. He acknowledged that it was possible the phone belonged to someone else in the car besides defendant.

On the phone, Detective Ayers recovered 10 photographs of interest and forwarded them to Detective Mike French. One of the photographs depicted a "black snub nose revolver with a brown handle," along with a silver semiautomatic handgun with a black grip. Another depicted two black snub nose revolvers with brown handles, one a larger caliber than the other. A third photograph was of defendant.

The People charged defendant with second degree robbery. The People further alleged defendant personally used a firearm during the

3

commission of the robbery, was previously convicted of a serious felony, and served two prior prison terms. Defendant pled not guilty.

Before trial began, defendant filed several motions in limine including a motion to "exclud[e] evidence of defendant's purported gang involvement or reference to defendant's gang tattoos," and "an order excluding evidence of a cell phone." The People argued the upper body tattoos depicted in the photograph of defendant were relevant to the victim's identification of defendant. Defendant argued the photograph was irrelevant and prejudicial because it showed defendant's gang-related tattoo and that he was making a gang sign and holding cash. These indicia of gang affiliation, he argued, were irrelevant to the People's case and highly prejudicial. The People agreed defendant's gang-affiliation was irrelevant. Defendant offered to take the photograph and block out the money and the gang sign. This would also at least partially obstruct the gang-related tattoo, which already was difficult to discern.

The trial court responded: "Why don't you [defense counsel], take a shot at what you think works and then we can have a further discussion about it. So I will defer the resolution of that because it sounds like with regard to the first part of it [the prosecutor] is not planning to go into the gang issue. He is simply looking at the tattoos as potential identification which would seem to the Court to have some relevance. [¶] [Defendant's Counsel]: Understood."

Defendant's trial counsel went on to argue defendant's motion in limine to exclude evidence of a cell phone. Trial counsel opened by saying, "this is a motion I prepared before I had subsequent discussions with [the prosecutor]. It's my belief that there is no phone, at least that is in [defendant's] name, so I don't know what the officer is going to testify to. [¶] The phone was found in the car. It was found on [defendant]. I guess we will just have to take a wait-and-see attitude. I assume pictures from a phone that weren't in his name may still be admissible under these circumstances, but, ...."

Defendant's counsel further explained that at the time of the traffic stop, defendant's phone was at his house. He acknowledged again that the photographs depicting defendant and the guns were "admissible anyway" but objected to "any characterization" that the phone belonged to defendant. The prosecutor clarified that during his interview with detectives, defendant told them the only cell phones taken at the traffic stop were his brother's and his friend's.

The court concluded the discussion: "Sounds like the only issue here really is a foundational one, whether the phone was in the car or was on [defendant's] possession. And either way, it would seem that the photographs on the phone would still come in so long as one of those foundations is laid.

"Am I missing something?

"[Defendant's Counsel]: For the purposes for which the photos are being introduced, I would agree, yes. If they were being introduced to establish that it was his phone and that has some other relevance,

I would disagree."

During trial, the gun photos were first presented during Sangha's testimony. Sangha testified that he recognized one of the guns in the photos as the gun used during the robbery. Defendant's counsel did not object.

All three photographs were presented later during Detective Mike French's testimony. Detective French testified the photographs were e-mailed to him by Detective Ayers, who said he took the photographs from defendant's phone. No objection was made.

The photographs were then published to the jury without objection. Detective French described the guns depicted in the photographs admitted as exhibits 5 and 6, and identified defendant as the person in the photograph admitted as exhibit 7. The gang sign and the cash were blocked out of the photograph depicting defendant, blocking which also partially obstructed defendant's gang-related tattoo.

On cross-examination, defendant's trial counsel asked Detective French whether he knew in fact the photographs came from a phone that belonged to defendant. Detective French said that was what he was told by Detective Ayers but he did not know whether Detective Ayers confirmed the phone belonged to defendant. Detective French never tried on his own to determine who the owner of the phone was because the owner of the phone was not relevant to his investigation.

Defendant's counsel also cross-examined Detective Ayers, who testified that he did not know for certain to whom the phone belonged but assumed it belonged to defendant because it was standard in their department that when a phone is placed outside an interview room, it belongs to the individual who is in that room. Detective Ayers acknowledged he could not tell from the photos to whom the guns belonged, nor who took the pictures or who was holding the guns. He also acknowledged the phone did not contain any pictures of defendant holding any of the guns.

The jury found defendant guilty as charged. In a bifurcated proceeding, the trial court found the enhancement allegations true. The court later sentenced defendant to an aggregate term of 27 years in state prison.

(People v. Williams, slip op. at *1-3.)

IV.  Standards for a Writ of Habeas Corpus

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States.  28 U.S.C. § 2254(a).  A federal writ is not available for alleged error in the interpretation or application of state law.  See Wilson v. Corcoran, 562 U.S. 1, 5 (2010); Estelle v. McGuire, 502 U.S. 62, 67-68 (1991).

5

1  　　　　Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas

2  corpus relief:

3  　　　　　　An application for a writ of habeas corpus on behalf of a person in
   　　　　　　custody pursuant to the judgment of a State court shall not be granted
4  　　　　　　with respect to any claim that was adjudicated on the merits in State
   　　　　　　court proceedings unless the adjudication of the claim -
5

6  　　　　　　　　(1) resulted in a decision that was contrary to, or involved an
   　　　　　　unreasonable application of, clearly established Federal law, as
   　　　　　　determined by the Supreme Court of the United States; or
7

8  　　　　　　　　(2) resulted in a decision that was based on an unreasonable
   　　　　　　determination of the facts in light of the evidence presented in the
   　　　　　　State court proceeding.
9

10  28 U.S.C. § 2254(d).

11  　　　　For purposes of applying § 2254(d)(1), "clearly established federal law" consists of

12  holdings of the United States Supreme Court at the time of the last reasoned state court decision.

13  Thompson v. Runnels, 705 F.3d 1089, 1096 (9th Cir. 2013) (citing Greene v. Fisher, 132 S. Ct.

14  38, 44-45 (2011)); Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011) (citing Williams v.

15  Taylor, 529 U.S. 362, 412 (2000)).  Circuit court precedent "may be persuasive in determining

16  what law is clearly established and whether a state court applied that law unreasonably." Stanley,

17  633 F.3d at 859 (quoting Maxwell v. Roe, 606 F.3d 561, 567 (9th Cir. 2010)).  However, circuit

18  precedent may not be "used to refine or sharpen a general principle of Supreme Court

19  jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced." Marshall

20  v. Rodgers, 569 U.S. 58, 64 (2013) (citing Parker v. Matthews, 132 S. Ct. 2148, 2155 (2012) (per

21  curiam)).  Nor may it be used to "determine whether a particular rule of law is so widely accepted

22  among the Federal Circuits that it would, if presented to th[e] [Supreme] Court, be accepted as

23  correct.  Id.  Further, where courts of appeals have diverged in their treatment of an issue, it

24  cannot be said that there is "clearly established Federal law" governing that issue. Carey v.

25  Musladin, 549 U.S. 70, 77 (2006).

26  　　　　A state court decision is "contrary to" clearly established federal law if it applies a rule

27  contradicting a holding of the Supreme Court or reaches a result different from Supreme Court

28  precedent on "materially indistinguishable" facts.  Price v. Vincent, 538 U.S. 634, 640 (2003).

1    Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant the

2    writ if the state court identifies the correct governing legal principle from the Supreme Court's

3    decisions, but unreasonably applies that principle to the facts of the prisoner's case. [3]  Lockyer v.

4    Andrade, 538 U.S. 63, 75 (2003); Williams v. Taylor, 529 U.S. at 413; Chia v. Cambra, 360 F.3d

5    997, 1002 (9th Cir. 2004).  In this regard, a federal habeas court "may not issue the writ simply

6    because that court concludes in its independent judgment that the relevant state-court decision

7    applied clearly established federal law erroneously or incorrectly.  Rather, that application must

8    also be unreasonable." Williams v. Taylor, 529 U.S. at 411.  See also Schriro v. Landrigan, 550

9    U.S. 465, 473 (2007); Lockyer, 538 U.S. at 75 (it is "not enough that a federal habeas court, in its

10   'independent review of the legal question,' is left with a "'firm conviction'" that the state court

11   was "'erroneous'"").  "A state court's determination that a claim lacks merit precludes federal

12   habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's

13   decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v. Alvarado, 541

14   U.S. 652, 664 (2004)).  Accordingly, "[a]s a condition for obtaining habeas corpus from a federal

15   court, a state prisoner must show that the state court's ruling on the claim being presented in

16   federal court was so lacking in justification that there was an error well understood and

17   comprehended in existing law beyond any possibility for fair-minded disagreement." Richter,

18   562 U.S. at 103.

19        If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing

20   court must conduct a de novo review of a habeas petitioner's claims.  Delgadillo v. Woodford,

21   527 F.3d 919, 925 (9th Cir. 2008); see also Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir. 2008)

22   (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of

23   § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by

24   considering de novo the constitutional issues raised").

25        The court looks to the last reasoned state court decision as the basis for the state court

26   _____

27   [3]  Under § 2254(d)(2), a state court decision based on a factual determination is not to be
     overturned on factual grounds unless it is "objectively unreasonable in light of the evidence
     presented in the state court proceeding."  Stanley, 633 F.3d at 859 (quoting Davis v. Woodford,

28   384 F.3d 628, 638 (9th Cir. 2004)).

1    judgment. <u>Stanley</u>, 633 F.3d at 859; <u>Robinson v. Ignacio</u>, 360 F.3d 1044, 1055 (9th Cir. 2004).

2    If the last reasoned state court decision adopts or substantially incorporates the reasoning from a

3    previous state court decision, this court may consider both decisions to ascertain the reasoning of

4    the last decision. <u>Edwards v. Lamarque</u>, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc). "When a

5    federal claim has been presented to a state court and the state court has denied relief, it may be

6    presumed that the state court adjudicated the claim on the merits in the absence of any indication

7    or state-law procedural principles to the contrary." <u>Richter</u>, 562 U.S. at 99. This presumption

8    may be overcome by a showing "there is reason to think some other explanation for the state

9    court's decision is more likely." <u>Id.</u> at 99-100 (citing <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 803

10   (1991)). Similarly, when a state court decision on petitioner's claims rejects some claims but

11   does not expressly address a federal claim, a federal habeas court must presume, subject to

12   rebuttal, that the federal claim was adjudicated on the merits. <u>Johnson v. Williams</u>, 568 U.S. 289,

13   298 (2013) (citing <u>Richter</u>, 562 U.S. at 98. If a state court fails to adjudicate a component of the

14   petitioner's federal claim, the component is reviewed de novo in federal court. <u>Wiggins v. Smith</u>,

15   539 U.S. 510, 534 (2003).

16        Where the state court reaches a decision on the merits but provides no reasoning to

17   support its conclusion, a federal habeas court independently reviews the record to determine

18   whether habeas corpus relief is available under § 2254(d). <u>Stanley</u>, 633 F.3d at 860; <u>Himes v.</u>

19   <u>Thompson</u>, 336 F.3d 848, 853 (9th Cir. 2003). "Independent review of the record is not de novo

20   review of the constitutional issue, but rather, the only method by which we can determine whether

21   a silent state court decision is objectively unreasonable." <u>Himes</u>, 336 F.3d at 853. Where no

22   reasoned decision is available, the habeas petitioner still has the burden of "showing there was no

23   reasonable basis for the state court to deny relief." <u>Richter</u>, 562 U.S. at 98.

24        A summary denial is presumed to be a denial on the merits of the petitioner's claims.

25   <u>Stancle v. Clay</u>, 692 F.3d 948, 957 & n.3 (9th Cir. 2012). While the federal court cannot analyze

26   just what the state court did when it issued a summary denial, the federal court must review the

27   state court record to determine whether there was any "reasonable basis for the state court to deny

28   relief." <u>Richter</u>, 562 U.S. at 98. This court "must determine what arguments or theories . . . could

8

1   have supported the state court's decision; and then it must ask whether it is possible fairminded

2   jurists could disagree that those arguments or theories are inconsistent with the holding in a prior

3   decision of [the Supreme] Court." Id. at 101.  The petitioner bears "the burden to demonstrate

4   that 'there was no reasonable basis for the state court to deny relief.'" Walker v. Martel, 709 F.3d

5   925, 939 (9th Cir. 2013) (quoting Richter, 562 U.S. at 98).

6          When it is clear, however, that a state court has not reached the merits of a petitioner's

7   claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal

8   habeas court must review the claim de novo.  Stanley, 633 F.3d at 860; Reynoso v. Giurbino, 462

9   F.3d 1099, 1109 (9th Cir. 2006).

10  V.  Petitioner's Claims

11          A.  *Ineffective Assistance of Trial Counsel (Ground One)*

12          Petitioner claims that defense counsel provided ineffective assistance when he

13  insufficiently objected to the admission of photographic evidence displaying petitioner's "gang

14  tattoos and of guns." (ECF No. 15 at 2-3.)   Respondent maintains the state court's rejection of

15  petitioner's claim was reasonable, thus, petitioner is not entitled to relief.  (ECF No. 21 at 14-18.)

16          The last reasoned rejection of petitioner's first claim is the decision of the California

17  Court of Appeal for the Third Appellate District on petitioner's direct appeal.  The state court

18  addressed this claim as follows:

19
20          Defendant then argues that he received ineffective assistance of
            counsel because trial counsel failed to "more fully object to
            admission of the evidence." We are not persuaded.

21
22          "[T]o establish a claim of ineffective assistance of counsel, defendant
            bears the burden of demonstrating, first, that counsel's performance
            was deficient because it 'fell below an objective standard of
23          reasonableness [¶] ... under prevailing professional norms.'" (*People
            v. Ledesma* (2006) 39 Cal.4th 641, 745–746.) "If the record 'sheds
24          no light on why counsel acted or failed to act in the manner
            challenged,' an appellate claim of ineffective assistance of counsel
25          must be rejected 'unless counsel was asked for an explanation and
            failed to provide one, or unless there simply could be no satisfactory
26          explanation.' " (*Id.* at p. 746.)

27
            First, with regard to the photograph depicting defendant's tattoos, the
28

9

claim was forfeited not because counsel failed to "more fully object" to the photograph but because counsel did not secure a ruling on the motion in limine. Why counsel did not feel the need to secure the ruling is apparent from the record: those portions of the photograph that trial counsel found particularly objectionable, the gang sign and the cash, were redacted from the photo before it was presented to the jury. Counsel had already achieved his stated goal—keeping the jury from seeing or hearing about the objectionable portions of the photograph. This is a reasonable basis for not pursuing a ruling or renewing the objection.

With regard to the gun photographs, counsel's only objection at trial was that the photographs could not be used to prove the cell phone from which they were taken belonged to defendant. Trial counsel was not asked why he did not also object to the photographs under Evidence Code section 352. It appears from the record, however, that trial counsel recognized the photographs had some relevance for identification of defendant as the robber and were admissible for that purpose. Instead of arguing that they were unduly prejudicial, counsel made the reasonable tactical decision to attack the weight of the photographs as evidence rather than their admissibility. Counsel questioned Detective Ayers extensively about his knowledge of who owned the phone and the process for determining ownership of a phone. Detective Ayers admitted that he could have determined ownership of the phone if he had applied for a warrant. Detective Ayers also testified he could not tell from the gun photographs who actually owned the guns or who was holding the guns when they were photographed, much less who took the photographs of the guns. Finally, defense counsel asked whether Detective Ayers found photographs on the phone of defendant with any firearms, to which he responded that he did not.

In sum, we conclude defendant has failed to show he received ineffective assistance of counsel at trial.

(People v. Williams, slip op. at *4-5.)

<u>Applicable Legal Standards</u>

To prevail on a claim of ineffective assistance of counsel, a petitioner must show that his trial counsel's performance "fell below an objective standard of reasonableness" and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland v. Washington, 466 U.S. 668, 687-88, 694 (1984).

Under the first prong of the Strickland test, a petitioner must show that counsel's conduct failed to meet an objective standard of reasonableness. Strickland, 466 U.S. at 687. There is "a

10

1   'strong presumption' that counsel's representation was within the 'wide range' of reasonable

2   professional assistance." <u>Richter</u>, 562 U.S. 86, 104 (2011) (quoting <u>Strickland</u>, 466 U.S. at 689).

3   Petitioner must rebut this presumption by demonstrating that his counsel's performance was

4   unreasonable under prevailing professional norms and was not the product of "sound trial

5   strategy." <u>Strickland</u>, 466 U.S. at 688-89.  Judicial scrutiny of defense counsel's performance is

6   "highly deferential," and thus the court must evaluate counsel's conduct from her perspective at

7   the time it occurred, without the benefit of hindsight.  <u>Id.</u> at 689.  "[S]trategic choices made after

8   thorough investigation of law and facts relevant to plausible options are virtually

9   unchallengeable." <u>Strickland</u>, 466 U.S. at 690.

10          The second prong of the <u>Strickland</u> test requires a petitioner to show that counsel's

11   conduct prejudiced him.  <u>Strickland</u>, 466 U.S. at 691-92.  Prejudice is found where "there is a

12   reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

13   would have been different."  <u>Id.</u> at 694.  A reasonable probability is one "sufficient to undermine

14   confidence in the outcome." <u>Id.</u> at 693.  "This does not require a showing that counsel's actions

15   'more likely than not altered the outcome,' but the difference between *Strickland*'s prejudice

16   standard and a more-probable-than-not standard is slight and matters 'only in the rarest case.'"

17   <u>Richter</u>, 562 U.S. at 112 (quoting <u>Strickland</u>, 466 U.S. at 693).  "The likelihood of a different

18   result must be substantial, not just conceivable."  <u>Id.</u>

19                              <u>Analysis</u>

20          Petitioner cannot overcome his burden.  A review of the state court decision and this

21   record reveals neither deficiency nor prejudice.

22          Defense counsel objected to the admission of photographs.  (<u>See</u> LD 1 at 112.)  More

23   particularly, defense counsel raised the issue on February 19, 2015:

24              [DEFENSE COUNSEL]: Your Honor, with respect to the in limine
                motions . . . [t]here was a cell phone that was taken from a car Mr.
25              Williams was in.  I believe the People's evidence might be it was
                taken from Mr. Williams.  I don't think it was, but certainly taken
26              from the car.

27              The phone is not admissible and he did not have a cell phone.  I made
                my objection in regard to the in limine through the admission of the
28              phone or the contents of the phone in sort of a two prong thing.

One, the phone was searched without a warrant and, two, shouldn't be any subscriber information in Mr. Williams' name.

The only reason I'm bring this up now is not to litigate that issue, but if the Court has any questions in that regard it might require one of the officers to come explain where he got the phone and maybe perhaps foundationally if he knows who the phone subscriber is.

I'm only putting that out there in case - - I don't want the middle of the afternoon there to be some big problem with addressing that in limine motion so would have to get the officer available or Mr. Miller can by way of offer of proof say this is what the officer would say or his - - give some information so we don't - - that doesn't come up as a stumbling block.

THE COURT:  Mr. Miller, are you planning to use the phone? [¶]

[PROSECUTOR]: I'm not planning to use the phone.  However, I am planning to use the photographs that were taken from it.  The defendant here was stopped in a car along with his brother, in fact, one week after the alleged robbery in this case.

There was a phone taken from him during that vehicle stop a week after. The phone was taken and searched pursuant to his parole status at the time and - -

THE COURT:  The phone was on the defendant's possession at this time?

[PROSECUTOR]: That is the way I read the police report.  I can certainly check with the Sacramento Police Department detective who wrote that report to see if, in fact, he had a recollection of where exactly the phone was.

But, there was a sharing of information between the detective working the robbery and the detective who took the phone from the defendant's possession a week later.

And they, in fact, shared information after it was connected - - later detectives learned that the first detective in working the robbery they began to share information.

So, the way I read it on the traffic stop is that in fact the phone was taken from the defendant and then searched or downloaded.  There was some photographs of it - - on it of one or more firearms that matched the description of the firearm used in the robbery.  So that's the connection.

THE COURT:  Mr. Grow.

MR. GROW: That's what I understand the People's evidence to be. I just - -

THE COURT: You want to be certain that in fact the phone was taken from your client's possession.

12

1    MR. GROW:  If it's important to the Court in deciding this in limine
2    motion with respect to that.  There's some pictures probably be some
     discussion on the admissibility of the pictures, at least one of them.

3    And you know if the phone is not in fact in his name, which I do not
     believe that it is, there's argument to be made with respect to the
4    contents of the phone.

5    THE COURT:  Let me suggest this.  What if Mr. Miller was to
     contact the officer and conclusively determine that in fact the officer
6    did take the phone from your client's possession and that would do
     that at this point.
7
     MR. GROW:  For purposes of the in limine probably.  It raises other
8    issues that I might to be respond.

9    THE COURT:  Understood.  Why don't you just make that phone
     call, Mr. Miller, then we can deal with that on Monday if there's a
10   need.

11   (LD 3 at 9-12 & ECF No. 29 at 3-6.)

12   When the issue was addressed the following Monday, the trial court deferred ruling on the issue

13   following this exchange:

14   [THE COURT]:  Number 9, excluding evidence about the gang. [¶]
     Is there any reason why that would come in about tattoos?
15
     [PROSECUTOR]:  Yes and no.  Um, as it relates to the introduction
16   of evidence of tattoos solely for the purpose of proving a gang
     affiliation, I absolutely in no way intent to do that whatsoever.  I think
17   any gang affiliation or involvement is entirely irrelevant, and I will
     admonish all of my witnesses that that is not to be discussed.
18
     Um, the issue as it relates to tattoos is that the named victim in this
19   case, who is an owner and long-time worker at the Florin cigarette
     shop, told the numerous law enforcement contacts he had contact
20   with in respect to the robbery - - and by that I mean patrol who
     responded, detectives later, um - - has been through and through
21   consistent that he instantly recognized the gunman in this case, who
     is alleged to be this defendant, as a former customer who would come
22   in almost on a daily basis to his store up until about a month prior to
     the robbery.  It had been roughly a month since he had last seen the
23   defendant.

24   In his descriptions of the perpetrator that he gave to law enforcement,
     the victim indicated that he recognized the presence of upper body
25   tattoos, neck tattoos and face tattoos on the subject.  This will later
     tie in, as the Court will see, to a phone that was taken during the
26   vehicle stop a week after this alleged robbery, um, where a phone
     was taken and later discovered to contain numerous photographs of
27   Mr. Williams with upper body tattoos and other tattoos, along with
     photographs of firearms that the victim later identified as the one
28   used in the May 17th alleged robbery.

13

So as it relates to tattoos, um, our issue here is one main tattoo that Mr. Williams has across his chest that reads quite largely "Ride Zilla". Um, Mr. Williams admitted during the May 24th traffic stop that he is a member of Ride Zilla. He is a validated member of that. Um, for purposes of this trial, I don't care about that. I don't care about that fact. I think it's irrelevant.

What I do think is relevant is the fact that on prior occasions this particular victim - and what you'll see in this robbery is the, um, gunman came in with a short-sleeved shirt on, sort of button up, … the victim had indicated to law enforcement hat he had previously seen the defendant come in in a tank top which, of course, um, allow for a better view of upper body tattoos. The tattoos on the phone, um - photographs of the defendant on the phone I think are relevant to show, in fact, that, yes, um, the defendant himself has upper body tattoos.

The problem for 352 is that almost every photograph of the defendant on his phone that was found is holding a large wad of cash and flashing some sort of a sign. Um, I don't think any of the jurors will know necessarily what it means, but it appear to be some sort of a gang sign. So it could be inflammatory in that respect; however, balanced against the relevant of the ID issue in this case where the victim is indicating, yes, this is the person that I have seen before, he had multiple upper body tattoos, neck tattoos, etcetera, I would think that is relevant to show that, in fact, Mr. Williams does have upper body type of tattoos without any specificity.

Um, he indicated to law enforcement he thought maybe that the defendant had tear drop tattoos, but as to the upper body tattoos and neck tattoos, there is never a description given in any fashion. In that regard he ended up selecting, um, Mr. Williams out of a photo lineup in less than five seconds, but that is, of course, just of the face. But I don't believe there has ever been a description given of the upper body tattoos by the victim to law enforcement.

THE COURT: Mr. Grow?

MR. GROW: Um, thank you. There is kind of two parts to this issue and problems for me. [¶]-[¶]

Um, on the date of the robbery the surveillance photo shows an individual, you can't really make out facial features, but purportedly Mr. Williams in theory here, wearing a short-sleeved shirt. You don't see any of these upper body tattoos at all. So I'm not sure of the relevance of the witness, um, in terms of identifying, yeah, that is a customer, he also has these other tattoos that weren't visible on the day of the robbery. His observation with respect to Mr. Williams on the day of the robbery doesn't include these other tattoos, so that wasn't part of his identification of him on that day.

Um, but even more importantly, the photos, if you were to consider allowing the photos, it wouldn't be difficult to crop out the offending part to me which is the, you know, the gang sign and the cash. Um, I think [the prosecutor] brought the photos or perhaps the clerk has

1    them, but you can see it wouldn't take much to crop those two things out to make them less prejudicial because they are highly prejudicial
2    if you have a guy with cash and gang signs.

3    So, one, I don't think it's relevant because none of these upper body tattoos were on display on the day of this robbery, so they are not
4    germane to his identification on that day.

5    THE COURT:  Why shouldn't I wait until the witness testifies, see how the testimony goes and then decide this issue? [¶]

6

7    MR. GROW:  I can offer this, Judge: He does say that - - the witness, in describing Mr. Williams, says, well, at least with respect to the photo array is - - Detective French asked him, How do you recognize
8    Mr. Williams? He says, It's just the face.  The whole face.  There is no reference to these body tattoos to this part of his identification of
9    Mr. Williams.

10    THE COURT:  The problem I'm having is this: If it goes to the issue of identification, it's relevant.  So the question becomes, the nature
11    of the testimony with regard to the tattoos to determine whether it is something that is generally specific or somewhere in between and
12    then how that fits in with the actual tattoos that the defendant has and how that fits in with the witness's testimony about the tattoos. So I
13    somewhat need to know what that witness is going to say.

14    MR. GROW:  And as I mentioned, Judge, if the Court is inclined to allow the photographs - -

15

16    THE COURT:  I think that part is easy.  If, in fact, the Court allows the photographs because of the tattoos, cropping out the gang sign and the wad of money seems like something that can be done or is it
17    blocking the exact tattoos that are in issue?

18    [PROSECUTOR]:  I printed out one and only one …. That's the one that I thought was the most benign.  So that is the one I printed and I
19    was going to offer.

20    THE COURT:  Do we have that here?

21    [PROSECUTOR]:  Yes. [¶]-[¶]

22    THE COURT:  Here's what I'm seeing on this particular photo: I'm seeing the tattoos much more pronounced on the left side of the photo
23    immediately above the hand sign. Um, on the other side of the photo, the right side, the defendant is holding a wad of cash. Immediately
24    above that I see some tattoos in there, but the photograph is darkened there, so it's really hard to see much.

25

26    MR. GROW:  To answer your question specifically, Judge, I could easily block those out.  They are blocking tattoos anyway.  So it's
27    just a matter of covering the gang sign, which is highly prejudicial, and the cash, which I think is not relevant and prejudicial as well. So
28    you could simply use – cover it with a piece of paper that's cut out to match those two things and it's going to obscure the gang signs or

1   you could actually cop it and still how those tattoos.

2   THE COURT:  Why don't you, Mr. Grow, take a shot at what you
    think works and then we can have a further discussion about it.  So I
3   will defer the resolution of that because it sounds like with regard to
    the first part of it [the prosecutor] is not planning to go into the gang
4   issue.  He is simply looking at the tattoos as potential identification
    which would seem to the Court to have some relevance.

5

6   (See LD 3 at 23-29 & LD 1 at 115.)

7       The Third District Court of Appeal's decision was neither contrary to, nor did it involve

8   an unreasonable application of, the Strickland standard.

9       As the state court indicated, the record reveals that defense counsel's objection to the

10  photograph offered by the People involved the specific depiction of petitioner holding a wad of

11  cash and "throwing" a gang sign, in addition to displaying upper body tattoos.  The gang sign and

12  cash depicted therein were redacted and not shown to the jury.  Defense counsel's representation

13  in that regard was effective, rather than deficient.

14      That left petitioner's upper body tattoos as depicted in the photograph.  The victim

15  testified extensively to those tattoos as they related to the victim's ability to identify petitioner as

16  the gun toting robber.  (See LD 3 at 59-60, 75, 92-94.)  The responding officer on the date of the

17  robbery testified the victim described the suspect's tattoos, including heavily tattooed arms, neck

18  and face.  (LD 3 at 108.)  Petitioner was known to the victim as a regular customer of the store

19  who was extensively tattooed.  (LD 3 at 53, 58-59, 72, 88, 107-08, 112, 148-49.)

20      Given that the basis for the victim's identification of petitioner as one of the two

21  individuals who robbed him involved the victim's prior interactions with petitioner as a heavily

22  tattooed, regular store customer and the victim having recognized petitioner through those

23  interactions, the photograph was plainly relevant and admissible based on identification.  (See

24  Cal. Evid. Code, §§ 350, 351, 352; People v. Booker, 51 Cal.4th 141, 187 (2011l) (photographic

25  evidence is generally admissible, just as all relevant evidence is admissible unless excluded by the

26  federal or state Constitution or by statute, and trial courts have broad discretion in determining

27  relevance); People v. Burwell, 44 Cal.2d 16, 34 (1955) (photographs, when relevant to the issues,

28  have evidentiary value).  See Jones v. Smith, 231 F.3d 1227, 1239 n.8 (9th Cir. 2000) (citing

16

1  Boag v. Raines, 769 F.2d 1341, 1344 (9th Cir. 1985) (an attorney's failure to make a meritless

2  objection or motion does not constitute ineffective assistance of counsel)); see also Matylinsky v.

3  Budge, 577 F.3d 1083, 1094 (9th Cir. 2009) (counsel's failure to object to testimony on hearsay

4  grounds was not ineffective where the objection would have been properly overruled); Rupe v.

5  Wood, 93 F.3d 1434, 1445 (9th Cir. 1996) ("the failure to take a futile action can never be

6  deficient performance").  The Third District Court of Appeal's determination that defense

7  counsel's attack as to the weight of the evidence,[4] rather than its admissibility, was a reasonable

8  tactical decision was not unreasonable.  Strickland, 466 U.S. at 687-90 (reasonable tactical

9  decisions, including decisions with regard to the presentation of the case, are "virtually

10  unchallengeable").

11       Moreover, petitioner did not, and cannot, establish prejudice.  Even assuming for the sake

12  of argument that defense counsel's failure to object or more fully object was a deficiency, there is

13  no reasonable probability of a different outcome in this case.

14       The robbery was committed by two men and petitioner's brother's fingerprints were found

15  at the scene of the robbery.  (LD 3 at 123-24, 153, 156; see also LD 3 at 113 [gunman never made

16  physical contact with anything in store].)  Petitioner's mother testified that petitioner and

17  petitioner's brother "always . . . hung out together" and were "extremely close."  (LD 3 at 100-

18  01.)  The brothers were pulled over in the company of one another a week following this robbery

19  incident.  (LD 3 at 119-22, 127, 154.)  The gun described by the victim on the date of the robbery

20  matched one of the guns depicted in a photograph admitted at trial, taken from a phone located at

21  the time of the vehicle stop.  (LD 3 at 77, 110, 151-52, 170-71.)  And the jury was instructed as to

22  the evaluation of witness testimony (LD 3 at 300-01), and clearly considered the victim's

23  testimony to be reliable.  Weeks v. Angelone, 528 U.S. 225, 226 (2000) (the court presumes the

24  jury followed the instructions given).  The victim's testimony did not involve only tattoos for

25  purposes of identification; rather, the victim also testified to his familiarity with petitioner's walk

26

27  _____

[4] LD 3 at 173-75, 178-79, 182-85.

28

1   or gait, facial expressions, and regular purchases of cigars.[5]  (LD 3 at 59, 75, 89, 92, 198.)

2          In sum, the state appellate court's decision was not contrary to, or an unreasonable

3   application of, clearly established Supreme Court authority.  As a result, the undersigned

4   recommends petitioner's claim as alleged in ground one of the second amended petition be

5   denied.

6          B.  *Admission of Certain Photographic Evidence Violated Due Process (Ground Two)*

7          Petitioner claims that the trial court abused its discretion in admitting photographs of

8   petitioner's upper body gang tattoos and guns, violating his rights to due process.  (ECF No. 15 at

9   3-5.)  Respondent contends this claim is procedurally defaulted and lacking in merit, thus

10  precluding relief.  (ECF No. 21 at 18-21.)

11         The last reasoned rejection of petitioner's claim is the decision of the California Court of

12  Appeal for the Third Appellate District on petitioner's direct appeal.  The state court addressed

13  this claim as follows:

> Defendant contends the trial court abused its discretion by admitting
> a photograph of defendant that showed his gang-related tattoos.
> Defendant moved in limine to exclude this photograph and the trial
> court deferred ruling on the motion. Defendant never reasserted the
> objections or pressed for a ruling when the photographs he now
> challenges were presented during trial. Accordingly, the issue has
> been forfeited. (See *People v. Ramos* (1997) 15 Cal.4th 1133, 1171
> [where party files a motion in limine but does not secure an express
> ruling from the court, argument is forfeited].)
>
> Defendant further contends the trial court abused its discretion in
> admitting photographs of multiple hand guns, when only one of the
> guns was identified by the victim as the gun used in the robbery. The
> additional guns, defendant argues, "were not relevant and were
> inflammatory" and thus inadmissible under Evidence Code section
> 352. Defendant did not raise this argument in the trial court.
>
> In the trial court, defendant moved in limine to exclude "evidence of
> a cell phone." In support of his motion, defendant argued the
> photographs from the cell phone, including the gun photos, could not
> be used as evidence the gun belonged to defendant. He essentially
> conceded the photographs were otherwise admissible.

---

[5] During testimony, the victim was asked whether he recognized the gunman's voice; he responded, "Kind of, yeah."  (LD 3 at 199.)

1
2
3
4
5
6
7

> The trial court ruled "the only real issue here is was it [defendant's] phone in terms of some kind of legal possession as opposed to having some actual or constructive possession. [The prosecutor] can at least elicit the testimony from the witnesses about the phone and we will see if there is an issue. And if there is, you can make an objection at that point." When the gun photographs were presented, defendant raised no objections. Under these circumstances, defendant's objection to admission of the gun photographs as unduly prejudicial has been forfeited and cannot be raised on appeal. (Evid. Code, § 353.

8    (People v. Williams, slip op. at *3-4.)

9                    Applicable Legal Standards

10    A state court's admission of evidence under state evidentiary law will form the basis for

11    federal habeas relief only where the evidentiary ruling "so fatally infected the proceedings as to

12    render them fundamentally unfair" in violation a petitioner's due process rights.  Jammal v. Van

13    de Kamp, 926 F.2d 918, 919 (9th Cir. 1991).  "[F]ailure to comply with the state's rules of

14    evidence is neither a necessary nor a sufficient basis for granting habeas relief."  Id.

15    The United States Supreme Court has "defined the category of infractions that violate

16    'fundamental fairness' very narrowly."  Dowling v. United States, 493 U.S. 342, 352 (1990).  The

17    high court "has made very few rulings regarding the admission of evidence as a violation of due

18    process."  Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009).  It has opted not to hold

19    that evidence of other crimes or bad acts "so infused the trial with unfairness as to deny due

20    process of law."  Estelle v. McGuire, 502 U.S. at 75 & n.5 (noting that the Court "express[ed] no

21    opinion on whether a state law would violate the Due Process Clause if it permitted the use of

22    'prior crimes' evidence to show propensity to commit a charged crime").  Moreover, the Supreme

23    Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence

24    constitutes a due process violation sufficient to warrant issuance of the writ."  Holley, 568 F.3d at

25    1101 (citing Carey v. Musladin, 549 U.S. at 77).  In the absence of clearly established law that

26    admission of even overtly prejudicial evidence constitutes a due process violation, the court

27    cannot conclude that the state court's ruling was an "unreasonable application."  Id.; see also

28    Larson v. Palmateer, 515 F.3d 1057, 1066 (9th Cir. 2008) (holding that because the Supreme

1    Court has expressly reserved the question of whether using evidence of a defendant's past crimes

2    to show that he has a propensity for criminal activity could ever violate due process, the state

3    court did not unreasonably apply clearly established law in determining that the admission of

4    defendant's criminal history did not violate due process).  A federal court is "without power" to

5    grant a habeas petition based solely on the admission of evidence.  Id.

6          Even setting aside the issue of clearly established federal law, "[a] habeas petitioner bears

7    a heavy burden in showing a due process violation based on an evidentiary decision." Boyde v.

8    Brown, 404 F.3d 1159, 1172 (9th Cir. 2005), as amended, 421 F.3d 1154 (9th Cir. 2005).  Again,

9    "'[t]he admission of evidence does not provide a basis for habeas relief unless it rendered the trial

10   fundamentally unfair in violation of due process.'" Holley, 568 F.3d at 1101.  "Only if there are

11   no permissible inferences the jury may draw from evidence can its admission violate due

12   process." Alcala v. Woodford, 334 F.3d 862, 887 (9th Cir. 2003) (emphasis in original); Houston

13   v. Roe, 177 F.3d 901, 910 n.6 (9th Cir. 1999).  "Even then, the evidence must 'be of such quality

14   as necessarily prevents a fair trial.'" Jammal v. Van de Kamp, 926 F.2d at 920 (citation omitted).

15   That can only occur if the admission of the evidence had a "'substantial and injurious effect or

16   influence in determining the jury's verdict.'" Brecht v. Abrahamson, 507 U.S. 619, 623 (1993)

17   (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)).

18                    Analysis

19                    *Procedural Default*

20         As to the state court's determination that petitioner forfeited his argument by failing to

21   reassert or press for a ruling concerning the photographs after the trial court initially deferred

22   ruling on the issue, the claim is procedurally barred.  Coleman v. Thompson, 501 U.S. 722, 749-

23   50 (1991); Paulino v. Castro, 371 F.3d 1083, 1092-93 (9th Cir. 2004) (failure to object at trial

24   bars federal habeas review).

25         A federal court will not review a petitioner's claims if the state court has denied relief of

26   those claims pursuant to a state law that is independent of federal law and adequate to support the

27   judgment. Ylst v. Nunnemaker, 501 U.S. at 801; Coleman v. Thompson, 501 U.S. at 729-30.  A

28   state court's refusal to hear the merits of a claim because of petitioner's failure to follow a state

                                          20

1   procedural rule is considered a denial of relief on independent and adequate state grounds.  <u>Harris</u>

2   <u>v. Reed</u>, 489 U.S. 255, 260-61 (1989).  This doctrine of procedural default is based on the

3   concerns of comity and federalism.  <u>Coleman</u>, 501 U.S. at 730-732.

4          Where a petitioner "failed to object to [the alleged error] at trial, his forfeiture under

5   California law constitutes a procedural default."  <u>Xiong v. Felker</u>, 681 F.3d 1067, 1075 (9th Cir.

6   2012) (noting that procedural rule must be firmly established and regularly followed and holding

7   that contemporaneous objection rule barred review of petitioner's claim); <u>see also</u> <u>Fairbank v.</u>

8   <u>Ayers</u>, 650 F.3d 1243, 1256-57 (9th Cir. 2011) (holding that "the California Supreme Court

9   applied an independent and adequate state procedural rule that bars federal review" based upon

10  the lack of objection at trial); <u>Vansickel v. White</u>, 166 F.3d 953, 958 (9th Cir. 1999) (holding

11  petitioner's claim was "procedurally barred by an adequate and independent state ground"

12  through California's contemporaneous objection rule).  The Ninth Circuit has repeatedly

13  recognized and applied the California contemporaneous objection rule in affirming denial of a

14  federal habeas petition on grounds of procedural default where there was a complete failure to

15  object at trial.  <u>See, e.g.</u>, <u>Inthavong v. Lamarque</u>, 420 F.3d 1055, 1058 (9th Cir. 2005).

16         Petitioner makes no showing that the contemporaneous objection rule was not an adequate

17  and independent basis for the appellate court's decision.  In addition, petitioner has not shown

18  cause for the default or prejudice resulting from it, or that a fundamental miscarriage of justice

19  would occur if this claim is not heard.  Nor has petitioner presented any evidence establishing his

20  actual innocence.  Therefore, petitioner is procedurally barred from bringing this claim.

21                            *Further Consideration*

22         Despite the procedural bar, the admission of photographs like those complained of here

23  does not involve an unreasonable application of Supreme Court precedent, which would entitle

24  petitioner to relief, because the Supreme Court "has not yet made a clear ruling that admission of

25  irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant

26  issuance of the writ."  <u>Holley</u>, 568 F.3d at 1101 (citing <u>Carey v. Musladin</u>, 549 U.S. at 77).  In the

27  absence of clearly established law that admission of even overtly prejudicial evidence constitutes

28  a due process violation, the court could conclude that the state court's ruling was an

21

"unreasonable application." Id.  Notably too, there is nothing in this record to indicate the admission of the photographs prevented a fair trial, nor did their admission have a substantial or injuries effect on the jury's verdict.  Jammal, 926 F.2d at 920; Brecht, 507 U.S. at 623.

Because the claim is procedurally barred, and because the state appellate court's disposition of petitioner's claim was not contrary to or an unreasonable application of Supreme Court precedent, a federal district court may not grant the writ based on the trial court's admission of the photographs.  Therefore, the undersigned recommends petitioner's claim as alleged in ground two of the second amended petition be denied.

VI.  Conclusion

Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  If petitioner files objections, he shall also address whether a certificate of appealability should issue and, if so, why and as to which issues.  A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(3).  Any response to the objections shall be filed and served within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated:  September 3, 2021

base.157

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE